FILED
10/28/2025 1:05 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025CH10999
Calendar, 15
35092271

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT – CHANCERY DIVISION

ST. PAUL PROTECTIVE INSURANCE
COMPANY f/k/a NORTHBROOK
PROPERTY AND CASUALTY INSURANCE
COMPANY

      Plaintiff,

v.

VERSATILE METALS, INC. AND UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY

      Defendants

Case No.: 2025CH10999
_____

---

### ST. PAUL PROTECTIVE INSURANCE COMPANY F/K/A NORTHBROOK PROPERTY AND CASUALTY INSURANCE COMPANY'S COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, St. Paul Protective Insurance Company f/k/a Northbrook Property and Casualty Company ("St. Paul"), pursuant to 735 ILCS 5/2-701, for its Complaint for Declaratory Judgment against Defendants Versatile Metals, Inc. ("Versatile Metals") and the United States Environmental Protection Agency ("USEPA") and, states as follows:

### INTRODUCTION AND NATURE OF ACTION

1.     This is an action pursuant to 735 ILCS 5/2-701 to determine and resolve questions of actual controversy under Illinois law concerning the availability and scope of insurance coverage, if any, for Versatile Metals and/or the USEPA (as the alleged assignee to the insurance rights of Versatile Metals under certain liability policies issued to Versatile Metals) with respect to the "Underlying Matter" (as subsequently defined herein), which includes but is not limited to a monetary Consent Decree entered in favor of the USEPA and against Versatile Metals in an underlying lawsuit ("USEPA Demand," as subsequently defined

1

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

herein). More specifically, this action seeks to determine the rights and duties of the parties under the primary business package policies and umbrella business liability policies St. Paul issued (from Northbrook's then-home office in Northbrook, Illinois, through a Chicago broker) to Named Insured Versatile Metals, located at 2125 Lively Blvd., Elk Grove Village, IL. These primary and umbrella policies issued by St. Paul to Versatile Metals are listed on **Exhibit A** to this Complaint and bear annual policy periods beginning on 9/13/1982 and ending on 9/29/1996 (the insurance policies listed on **Exhibit A** are collectively, separately, and in any combination referred to herein as the "St. Paul Policies"). St. Paul incorporates by reference each of the St. Paul Policies in their entirety as if fully set forth in this Complaint for all purposes.

2.     This action stems in part from a Consent Decree that Versatile Metals entered into with the USEPA to resolve the claims asserted against Versatile Metals in an underlying lawsuit filed by the USEPA on or around September 25, 2018 in the United States District Court for the Eastern District of Pennsylvania, captioned: *United States of America v. Versatile Metals*, Case No. 2:18-cv-04126-JP (the "Underlying Lawsuit"). The USEPA's Complaint in the Underlying Lawsuit is attached as **Exhibit B**.

3.     The USEPA brought the Underlying Lawsuit pursuant to Sections 107(a)(2) and 113(g)(2) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") seeking to recover from Versatile Metals the response costs the USEPA allegedly incurred when taking response actions in connection with the release of hazardous substances, including PCBs, at the Metal Bank of America, Inc. Superfund Site located in Philadelphia, Pennsylvania (the "Site").

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

4.      The USEPA alleged in the Underlying Lawsuit that Versatile Metals conducted operations at the Site from January 4, 1985 until May 23, 1985, and during that time, hazardous substances were discharged at the Site. The USEPA further alleged that, as a result, Versatile Metals is jointly and severally liable under Section 107(a)(2) of CERCLA for the response costs incurred by the USEPA with respect to the Site. (**Exhibit B**, ¶¶ 12; 34).

5.      On or around November 15, 2018, without the written consent of St. Paul, St. Paul's insured, Versatile Metals, entered into a Consent Decree with the USEPA to resolve the claims asserted against Versatile Metals in the Underlying Lawsuit.  The Consent Decree agreed to in the Underlying Lawsuit is attached as **Exhibit C**.

6.      Pursuant to the Consent Decree, Versatile Metals agreed to the entry of a Monetary Judgment against itself in the Underlying Lawsuit and in favor of the USEPA in the amount of $1,442,174.47. Versatile Metals also agreed to pay the USEPA $42,000 and purportedly assigned to the USEPA its rights to the insurance benefits under certain of the St. Paul Policies (the primary and umbrella St. Paul Policies issued annually to Versatile Metals from August 29, 1984 to August 29, 1986) for the remainder of the Monetary Judgment.  (**Exhibit C**, p. 5).

7.      Now, the USEPA, as a purported assignee to the rights of Versatile Metals under these St. Paul Policies, seeks insurance coverage under these Policies for the Monetary Judgment entered in its favor in the Underlying Lawsuit, less Versatile Metal's payment of $42,000 (the "USEPA Demand").  Versatile Metals also seeks insurance coverage from St. Paul for the Underlying Matter under the St. Paul Policies.  The USEPA Demand, Consent Decree, Underlying Lawsuit, Versatile Metals' claim for insurance coverage, and Metal Bank Action

3

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

(subsequently defined herein) are collectively, separately, or in any combination referred to herein as the "Underlying Matter."

8.      St. Paul denies that insurance coverage is available to Versatile Metals and/or the USEPA (as the alleged assignee of the insurance rights of Versatile Metals) under the St. Paul Policies for the Underlying Matter.  St. Paul therefore requests that this Court (a) declare that St. Paul has no obligation to provide insurance coverage to Versatile Metals and/or the USEPA (as the alleged assignee of the insurance rights of Versatile Metals) for the Underlying Matter under the St. Paul Policies as set forth more fully below and (b) award St. Paul all other relief this Court deems just and proper.

## THE PARTIES

9.      Plaintiff St. Paul is an insurance company incorporated in the State of Connecticut, with its principal place of business in Hartford, Connecticut.

10.     Defendant USEPA is an executive agency of the United States government, and its principal address is 1200 Pennsylvania Avenue, N.W., Washington, D.C. 20460.

11.     Defendant Versatile Metals is a corporation formed under the laws of the State of Kentucky, with its current principal place of business in Schaumburg, Illinois.  Versatile Metals conducts and transacts business in the State of Illinois.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action, as it involves a justiciable matter relating to the application of insurance policies issued by St. Paul from Northbrook's then-home office in Northbrook, IL to Named Insured Versatile Metals, then located at 2125 Lively Blvd., Elk Grove Village, IL.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

13.     This Court has personal jurisdiction over St. Paul as it conducts business in the State of Illinois.

14.     This Court has personal jurisdiction over Versatile Metals because its current principal place of business is in Schaumburg, Illinois.

15.     The Court has personal jurisdiction over USEPA.

16.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, because this is the county in which the transaction or some part thereof occurred out of which the causes of action arose.

17.     Venue is also proper in Cook County pursuant to 735 ILCS 5/2-103(a), because this is the county in which Versatile Metals' principal place of business is located, and the county in which the St. Paul Policies were issued.

## FACTUAL BACKGROUND

### Versatile Metal's Lease of the Site

18.     The Site is located at 6801 New State Road, Philadelphia, Pennsylvania and consists of approximately six acres, most of which is currently covered by an asphalt cap.

19.     The Site is bordered by Cottman Avenue on the west.  A subterranean sewer line owned by the City of Philadelphia is located at the southern end of Cottman Avenue, which drains to the Delaware River.

20.     From at least 1969 to 1984, Non-Party Metal Bank of America, Inc. ("Metal Bank"), a former owner of the Site, operated a metal scrapyard and transformer-reclamation facility at the Site.  Metal Bank processed used transformers to reclaim the copper cores and irons castings for sale.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

21.     As noted in the Underlying Lawsuit, "[e]lectrical transformers, like the ones processed by Metal Bank at the Site, generally had an outer metal casing with a copper core immersed in dielectric fluid or oil used for insulation and cooling purposes.  Dielectric fluids in scrap transformers processed at the Site frequently contain polychlorinated biphenyls ('PCBs')..."  (**Exhibit B**, ¶ 9).

22.     On January 4, 1985, Versatile Metals entered into an Asset Purchase Agreement and Lease Agreement with Metal Bank (the "Purchase/Lease Agreement") to liquidate the remaining scrap metal inventory at the Site.

23.     The Purchase/Lease Agreement contained the following condition:

4.05 *Environmental Matters*.  Seller [Metal Bank] and Union[1] jointly and severally represent and warrant to Buyer [Versatile Metals] that as of November 26, 1984 the land included in the Leased Premises was free of contamination in violation of any applicable federal, state or local law or regulation relating to the protection of health, safety and environment. Seller and Union jointly and severally agree to indemnify and hold Buyer harmless from any and all costs, damages, liabilities and expenses resulting from hazardous waste in the Inventory existing on and the land included in the Leased Premises at November 20, 1984, provided that, with respect to the Inventory, Buyer acts in the following manner:

(a) Buyer shall keep all Inventory purchased hereunder segregated from any other inventories of Buyer;

(b) Buyer shall give seller prompt telephone notice (tel. 412–362–1700, attention Raymond Beacha or Raymond T. Royko, or to such other number or persons as Seller may direct by written notice to Buyer) upon discovery of capacitors or other items in such inventory that may contain hazardous waste and shall at the sole expense, risk and liability of Seller cooperate with Seller in Seller's removal and shipment of such items; and

(c) Buyer shall act in a reasonable manner both before and after discovery of items containing hazardous wastes in order to prevent leakage and otherwise minimize contamination or other damage.

---

[1] Union refers to The Union Corporation.  At all relevant times, Metal Bank was a wholly owned subsidiary of The Union Corporation.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

24.     Pursuant to the Purchase/Lease Agreement, Versatile Metals purchased the Site's inventory, equipment, and machinery from Metal Bank. Additionally, Versatile Metals leased the Site from Metal Bank from January 4, 1985 to May 23, 1985, during which time Versatile Metals continued to perform operations and sell the remaining scrap metal at the Site.

25.     In April of 1985, Versatile Metals discovered substantial areas of oily ground at the Site. Versatile Metals directed Metal Bank's chemist to take samples of certain areas at the Site, and soil samples revealed substantial PCB contamination.

26.     Due to the contamination, Metal Bank requested that Versatile Metals vacate the Site. Versatile Metals complied and vacated the Site on May 23, 1985.

27.     Although Versatile Metals was an insured under the St. Paul Policies in April of 1985, contrary to the conditions precedent to coverage in those Policies, Versatile Metals did not provide notification of the contamination at the Site to St. Paul.

**Versatile Metal's Lawsuit Against Metal Bank**

28.     On July 16, 1985, Versatile Metals filed a lawsuit against Metal Bank in the United States District Court for the Eastern District of Pennsylvania, captioned: *Versatile Metals, Inc. and Versatile Oxide, Inc v. The Union Corporation and the Metal Bank of America*, Case No. 85-4085 (the "Metal Bank Action").

29.     In the Metal Bank Action, Versatile Metals alleged that Metal Bank breached the Lease/Purchase Agreement in several respects, including by failing to comply with the warranty set forth under condition 4.05 of the Lease/Purchase Agreement that as of November 26, 1984, the Site was free of contamination.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

30.     In response to the Metal Bank Action, Metal Bank asserted several counterclaims against Versatile Metals, including a private-party cost-recovery action under Section 107(a)(4)(B) of CERCLA.

31.     Metal Bank's private-party cost-recovery counterclaim alleged that Versatile Metals, as an operator at the Site, is a "responsible party" under CERCLA.  As such, Metal Bank claimed it was entitled to contribution from Versatile Metals for all clean-up costs incurred by Metal Bank to remedy the release and threatened release of PCBs at the Site.

32.     Although Versatile Metals was an insured under the St. Paul Policies at the time of the Metal Bank Action, contrary to the conditions precedent to coverage in those Policies, Versatile Metals did not provide notice to St. Paul of the counterclaims asserted against it in the Metal Bank Action.

33.     Without St. Paul's knowledge, Versatile Metals unsuccessfully litigated Metal Bank's private-party cost-recovery counterclaim.

34.     The jury determined that the Site was substantially contaminated both before and after Versatile Metals took possession of the Site.  The jury also found that the contamination which occurred at the Site after Versatile Metals took possession was the result of Versatile Metals' mishandling of the hazardous waste in Metal Bank's inventory that had remained on the Site.

35.     The jury ultimately found that, despite Versatile Metal's brief five-month lease tenancy at the Site, Versatile Metals was fifty-five percent responsible for the contamination at the Site, while Metal Bank was forty-five percent responsible.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

**USEPA's Response Actions at the Site**

36.     Following the Metal Bank Action, in 1995, the USEPA began investigating the Site.

37.     The USEPA conducted extensive investigations at the Site, including in 2007 and 2008, which, on both occasions, revealed elevated levels of PCBs and other hazardous substances in soils at the Site.

38.     In 2011, the USEPA conducted an additional investigation at the Site and found that PCBs were being released via groundwater into the sewer line owned by the City of Philadelphia.

39.     On September 28, 2011, the USEPA issued an Action Memorandum detailing the response actions to be taken at the Site to remedy the release and threatened release of PCBs and other hazardous substances.

40.     On December 16, 2014, the USEPA sent a Notice of Potential Liability and Offer to Negotiate to Versatile Metals.  The Notice advised Versatile Metals that USEPA has documented a release of hazardous substances at the Site, and that USEPA had spent and is considering spending additional public funds to remedy the release of the hazardous substances at the Site.

41.     Between October 2015 and October 2016, the USEPA conducted a removal action at the Site, in accordance with the response actions detailed in the September 28, 2011 Action Memorandum.

42.     The USEPA allegedly incurred $1,442,174.47 in response costs throughout the removal action at the Site.

FILED DATE: 10/28/2025 1:05 PM    2025CH10999

**The Underlying Lawsuit**

43.     On September 25, 2018, the USEPA filed the Underlying Lawsuit against Versatile Metals seeking to recover the $1,442,174.47 in response costs that the USEPA allegedly incurred throughout the removal action at the Site.

44.     The USEPA's Complaint in the Underlying Lawsuit in part relied upon the jury's findings in the Metal Bank Action to support the contention that Versatile Metals is responsible for the contamination at the Site.  (**Exhibit B**, ¶¶ 18-19).

45.     On or around November 15, 2018, Versatile Metals entered into a Consent Decree with the USEPA to settle the Underlying Lawsuit.

46.     Pursuant to the Consent Decree, Versatile Metals agreed to the entry of a Monetary Judgment against itself and in favor of the USEPA in the amount of $1,442,174.47. Versatile Metals also agreed to pay the USEPA $42,000 and purportedly assigned to the USEPA its rights to insurance benefits under certain of the St. Paul Policies for the remainder of the Monetary Judgment.  (**Exhibit C**, p. 5).

47.     Specifically, Versatile Metals purportedly assigned its rights to insurance benefits under the policies listed in Appendix B to the Consent Decree:

Policy No. BPP0136177 (policy period August 29, 1984 to August 29, 1985)

Policy No. UEL0136179 (policy period August 29, 1984 to August 29, 1985)

Policy No. BPP0136177 (policy period August 29, 1985 to August 29, 1986)

Policy No. UEL0136179 (policy period August 29, 1985 to August 29, 1986).

48.     Now, in addition to Versatile  Metals seeking coverage from St. Paul under the St. Paul Policies for the Underlying Matter, the USEPA, as an alleged assignee to the rights of

10

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

Versatile Metals under certain of the St. Paul Policies, also seeks coverage under those Policies for the USEPA Demand.

**THE ST. PAUL POLICIES**

**The Primary St. Paul Policies**

49.     St. Paul issued primary-level business package policies (each containing a general liability coverage part) to Named Insured Versatile Metals, with annual policy periods beginning on 9/13/1982 and ending on 9/29/1996.  These primary business package policies are collectively, separately or in any combination, referred to herein as the "Primary St. Paul Policies."

50.     The Primary St. Paul Policies are in writing and constitute the best evidence of their terms and St. Paul hereby incorporates by reference the Primary St. Paul Policies as a written instrument as if fully set forth in this Complaint.  Copies of each of the Primary St. Paul Policies are attached hereto as **Exhibit D1 – D25**; several of those Policies are certified as complete**.**

51.     The General Liability ("GL") coverage part of the Primary St. Paul Policies states in part as follows:[2]

**SECTION III – GENERAL LIABILITY**

**BROADENED GENERAL LIABILITY FORM**

* * *

**PART I – COMPREHENSIVE GENERAL LIABILITY INSURANCE**

**COVERAGE AGREEMENT**

---

[2] St. Paul herein quotes from the Primary St. Paul Policy **Exhibit D4 (Policy No. BPP 0136177, effective August 29, 1985 to August 29, 1986)**, but the provisions in the other Primary St. Paul Policies contain the same or substantively similar language.

11

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

**Coverage A – Bodily Injury**
**Coverage B – Property Damage**

The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and many make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any such claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements;

**EXCLUSIONS**

This part does not insure:

\* \* \*

**(f)** bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapor, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

\* \* \*

**(j)** Property Damage:

**(1)** to property owned or occupied by or rented to the Insured, or, except with respect to the use of elevators, to property held by the Insured for sale or entrusted to the Insured for storage or safekeeping;

\* \* \*

**(3)** to that particular part of any property (i) upon which operations are being performed by or on behalf of the Insured; or (ii) out of which such injury or destruction arises;

\* \* \*

**PERSONS INSURED**

Each of the following is an Insured under this part to the extent set forth below:

\* \* \*

12

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

(c) if the Named Insured is designated in the Declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director, shareholder, stockholder or employee thereof while acting within the scope of their duties as such;

\* \* \*

## GENERAL PROVISIONS

### GENERAL CONDITIONS APPLICABLE TO THE ENTIRE POLICY

\* \* \*

**5. Assignment**

Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon; if, however, the Named Insured shall die, such insurance as is afforded by this policy shall apply (1) to the Named Insured's legal representative, as the Named Insured, but only while acting within the scope of his duties as such and (2) with respect to the property of the Named Insured, to the person having proper temporary custody thereof, as Insured, but only until the appointment and qualification of the legal representative; provided that notice of cancellation addressed to the Insured named in the Declarations and mailed to the post office address shown in the policy shall be sufficient notice to effect cancellation of this policy.

\* \* \*

### GENERAL CONDITIONS APPLICABLE TO SECTION III

\* \* \*

**32. Insured's Duties in the Event of Occurrence, Claim, Suit or Loss**

**(a)** In the event of an occurrence, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the Insured to the Company or any of its authorized agents as soon as practicable.

**(b)** If claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.

13

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

**(c)** The Insured shall cooperate with the Company and, upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of injury or damage with respect to which insurance is afforded under this policy; and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at its own cost, voluntarily make any payment assume any obligation or incur any expense other than for first aid to others at the time of accident.

\* \* \*

**DEFINITIONS – APPLICABLE ONLY TO SECTION III**

When used in this policy:

\* \* \*

"Insured" means any person or organization qualifying as an Insured in the "Persons Insured" provision of the applicable insurance form. The insurance afforded applies separately to each Insured against whom claim is made or suit is brought, except with respect to the limits of the Company's liability;

\* \* \*

"Named Insured" means the person or organization named in the Declarations of this policy.

\* \* \*

"occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured;

\* \* \*

"property damage" means (1) physical injury to or destruction of tangible property which occurs during the effective period of this insurance, including loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the effective period of this insurance;

\* \* \*

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

**The Umbrella St. Paul Policies**

52.      St. Paul also issued umbrella business liability policies to Named Insured Versatile Metals, with annual policy periods beginning on 9/13/1982 and ending on 9/29/1996.  These umbrella business liability policies are collectively, separately, or in any combination, referred to herein as the "Umbrella St. Paul Policies."

53.      The Umbrella St. Paul Policies are in writing and constitute the best evidence of their terms and St. Paul hereby incorporates by reference the Umbrella St. Paul Policies as a written instrument as if fully set forth in this Complaint.  Copies of each of the Umbrella St. Paul Policies are attached hereto as **Exhibit D26 – D39**; several of those Policies are certified as complete.

54.      The Umbrella St. Paul Policies state in part as follows:[3]

## I.      INSURING AGREEMENT

The Company will pay on behalf of the Insured all the sums which the Insured shall be legally obligated to pay as ultimate net loss, because of

   **A.**  Bodily Injury

   **B.**  Property Damage

   **C.**  Personal Injury, or

   **D.**  Advertising Liability

caused by an occurrence during the policy period anywhere in the world.

## II.      EXCLUSIONS

This policy does not apply:

---

[3] St. Paul herein quotes from the Umbrella St. Paul Policy **Exhibit D29 (Policy No. UEL 0136179, effective August 29, 1985 to August 29, 1986)**, but the provisions in the other Umbrella St. Paul Policies contain the same or substantively similar language.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

\* \* \*

**(c)** to property damage to (1) property owned by any Insured or (2) property rented to, occupied or used by or in the care, custody or control of the Insured to the extent that any Insured is under contract to provide insurance therefor;

\* \* \*

### Exclusion of Damage To Real Property Endorsement[4]

\* \* \*

Notwithstanding exclusion (c) of this policy, this policy does not apply to property damage to real property occupied by, or leased or rented to, the Insured.

### Pollution Or Contamination Exclusion – Absolute [5]

\* \* \*

(1) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere, any water course, body of water, or nature underground waters.

\* \* \*

## III.    DEFENSE AND SUPPLEMENTARY PAYMENTS

With respect to an occurrence:

**1.**  which is not covered by the underlying policies of insurance described in the Schedule of Underlying Insurance, or any other underlying insurance collectible by the Insured; or

**2.**  for which no underlying insurer is obligated to defend the Insured; but

**3.**  the occurrence is one for which coverage is afforded by this policy, including claims solely within the Insured's self-retained limit;

the Company will

---

[4] This Exclusion of Damage to Real Property Endorsement was added to the Umbrella St. Paul Policies by virtue of Endorsement CL300-1A.

[5] This Pollution or Contamination Exclusion – Absolute was added to the Umbrella St. Paul Policies by virtue of Endorsement CL431.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

**(a)** defend any suit against the Insured alleging bodily injury, property damage, personal injury or advertising liability and seeking damages therefore, even if such suit is groundless, false or fraudulent; but the Company may make such investigation, negotiation or settlement of any claim or suit as it deems expedient. The Insured shall promptly reimburse the Company for any amount paid in satisfaction of cases defended hereunder within the retained limit but excluding all loss expense and legal expense incurred by the Company.

\*\*\*

The Company shall have the right to associate with the Insured in the defense and control of any claim or proceeding for which coverage may be afforded by this policy. In such event the Insured and the Company shall cooperate fully.

## IV.   PERSONS INSURED

Each of the following is an Insured under this policy to the extent set forth below:

\* \* \*

**(c)** if the Named Insured is designated in the declarations as a corporation, the corporation so designated; and if the following relationships apply at the inception date of this policy, any subsidiary company of the Named Insured and any other company under the Named Insured's control and active management.

\* \* \*

## VI.   DEFINITIONS

When used in this policy (including endorsements forming a part hereof):

\* \* \*

**5.** "**occurrence**" means:

**(1)** bodily injury or property damage sustained during the policy period from an accidental happening, including continuous or repeated exposure to conditions, all such bodily injury and property damage arising from one accidental happening being subject to the Limits of Liability stated in Declaration 4 for each occurrence;

\* \* \*

**9.** "**property damage**" means:

17

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

**i.** physical injury to tangible property other than

    **(a)** the Insured's products or any part thereof out of which the physical injury arises, or

    **(b)** work performed by or on behalf of the Insured or any portion thereof, or out of materials, parts or equipment furnished in connection therewith out of which the physical injury arises

which occurs during the policy period including loss of use of the physically injured tangible property at any time, or

**(2)** loss of use of tangible property which has not been physically injured if the loss of use results from physical injury during the policy period to tangible property other than

    **(a)** the Insured's products or any part thereof out of which the physical injury arises, or

    **(b)** work performed by or on behalf of the Insured or any portion thereof, or out of materials, parts or equipment furnished in connection therewith out of which the physical injury arises.

**10.** "**retained limit**" means the sum stated in Declaration 5 which, in the absence of underlying insurance, the Insured shall retain as self insurance with respect to each occurrence;

**11.** "**ultimate net loss**" means the sum actually expended or payable in cash to procure settlement or satisfaction of the Insured's legal obligation for damages either by (1) final adjudication or (2) compromise with the written consent of the Company; however, ultimate net loss shall not include salaries of the Insured's employees or expenses incurred by the Insured in investigation, adjustment or litigation.

## VII.    CONDITIONS

* * *

### 3.  Insured's Duties in the Event of Occurrence, Claim, Suit or Loss

    **(a)** In the event of an occurrence, written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the Insured to the Company or any of its authorized agents as soon as practicable.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

**(b)** If claim is made or suit is brought against the Insured, the Insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.

**(c)** The Insured shall cooperate with the Company and, upon the Company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the Insured because of bodily injury, property damage, personal injury, or advertising liability with respect to which insurance is afforded under this policy; and the Insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The Insured shall not, except at its own cost, voluntarily make any payment assume any obligation or incur any expense.

\* \* \*

10. **Assignment**

Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon; if, however, the Named Insured shall die, such insurance as is afforded by this policy shall apply (1) to the Named Insured's legal representative, as the Named Insured, but only while acting within the scope of his duties as such, and (2) with respect to the property of the Named Insured, to the person having proper temporary custody thereof, as Insured, but only until the appointment and qualification of the legal representative.

\* \* \*

## COUNT I
### DECLARATORY JUDGMENT THAT THERE IS NO INSURANCE COVERAGE AVAILABLE UNDER THE PRIMARY ST. PAUL POLICIES FOR THE UNDERLYING MATTER

55.     St. Paul incorporates by reference the allegations of paragraphs 1-54 of this Complaint as if restated herein.

56.     Based on the facts alleged in the preceding paragraphs of this Complaint, there is no insurance coverage in whole or in part under the Primary St. Paul Policies for Versatile Metals and/or the USEPA (in its capacity as an alleged assignee of Versatile Metals under

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

certain Primary St. Paul Policies) for the Underlying Matter for some or all of the reasons that follow:

a. There is no insurance coverage under the Primary St. Paul Policies to the extent the Underlying Matter does not seek damages because of "property damage" caused by an "occurrence" as those terms are defined in the GL coverage part of the Primary St. Paul Policies.

b. There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent that the damages sought do not constitute sums which the insured is legally obligated to pay as damages.

c. There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent it does not constitute a claim for "property damage" as that term is defined in those Policies.

d. There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter if "property damage" was expected or intended from the standpoint of the insured.

e. There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent it does not seek damages because of "property damage" that occurred during the pertinent policy periods of the Primary St. Paul Policies.

f. There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent it seeks damages because of "property damage" that occurred prior and/or subsequent to the effective period of insurance for the Primary St. Paul Policies.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

g. There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent it does not satisfy all elements of the coverage agreement under the Primary St. Paul Policies.

h. There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent it constitutes a known risk, known loss, or loss-in-progress.

i. There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent a pollution exclusion precludes coverage.

j. There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent it involves "property damage" to property occupied by or rented to the insured.

k. There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent there is property damage to that particular part of any property (i) upon which operations are being performed by or on behalf of the Insured.

l. There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent Versatile Metals assigned its interests under the Primary St. Paul Policies to the USEPA without St. Paul's written consent.

m. There is no insurance coverage for the USEPA under the Primary St. Paul Policies for the Underlying Matter because there was no valid assignment of interests in those Policies by Versatile Metals to the USEPA.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

n.  There is no insurance coverage for the USEPA under the Primary St. Paul Policies to the extent the USEPA released Versatile Metals before any purported assignment of interest in the Primary St. Paul Policies was effective.

o.  There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter because Versatile Metals failed to give timely and adequate written notice to St. Paul of any occurrence, claim or suit.

p.  There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter because Versatile Metals voluntarily made and/or undertook payment(s), assumed obligation(s) and/or incurred expense(s) other than for first aid to others at the time of accident without St. Paul's knowledge and consent.

q.  There is no insurance coverage under the Primary St. Paul Policies to the extent that Versatile Metals has harmed, reduced, prejudiced and/or impaired, in whole or in part, the contribution and/or subrogation rights of St. Paul with respect to the Underlying Matter.

r.  There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter for any defense or indemnity costs incurred or obligations undertaken prior to the tender of Underlying Matter for which those payments arose (i.e. pre-tender costs).

s.  There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent that it seeks to hold St. Paul liable for sums assessed as punitive damages, exemplary damages, fines or penalties.

22

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

t.   There is no insurance coverage under the Primary St. Paul Policies for the Underlying Matter to the extent Versatile Metals negligently or intentionally failed to represent or disclose to St. Paul or concealed or misrepresented to St. Paul facts which were material and known by Versatile Metals in order to induce St. Paul to issue one or more of the Primary St. Paul Policies, or to assume certain risks in such policies.

u.   To the extent that it is determined that insurance coverage exists (defense and/or indemnity) under one or more of the Primary St. Paul Policies for the Underlying Matter,  such finding is subject to proper allocation of any defense costs and/or covered damages across all time periods during which property damage occurred.

v.   To the extent insurance coverage applies under the Primary St. Paul Policies, costs incurred to investigate or evaluate the nature and scope of the contamination and remediation in the Underlying Matter, including but not limited to remedial investigation and feasibility costs, would constitute indemnity costs under the Policies.

w.   There is no insurance coverage under the Primary St. Paul Policies to the extent that any other terms, definitions, exclusions, conditions and/or endorsements not specifically identified herein apply to preclude insurance coverage for the Underlying Matter, in whole or in part.

x.   To the extent that the applicable limits of liability of the Primary St. Paul Policies have been impaired or exhausted, in whole or in part, by the payment

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

of claims, the limits of liability under the policies shall be reduced or eliminated by the amount of such prior payment of claims.

y.  There is no insurance coverage under the Primary St. Paul Policies to the extent the Policy only provides insurance coverage for a policy territory that does not include Pennsylvania.

<div align="center">

**<u>COUNT II</u>**
**DECLARATORY JUDGMENT THAT THERE IS NO INSURANCE COVERAGE AVAILABLE UNDER THE UMBRELLA ST. PAUL POLICIES FOR THE UNDERLYING MATTER**

</div>

57.     St. Paul incorporates by reference the allegations of paragraphs 1-54 of this Complaint as if restated herein.

58.     Based on the facts alleged in the preceding paragraphs of this Complaint, there is no insurance coverage in whole or in part under the Umbrella St. Paul Policies for Versatile Metals and/or the USEPA (in its capacity as an alleged assignee of Versatile Metals under certain Umbrella St. Paul Policies) for the Underlying Matter for the reasons that follow:

a.  There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter, in whole or in part, to the extent the Underlying Matter is not covered, in whole or in part, under the Primary St. Paul Policies for any reason(s) set forth in paragraph 56 a.- y. of this Complaint.

b.  There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent the Underlying Matter does not seek damages that constitute ultimate net loss in excess of the applicable limits of underlying insurance and any other available underlying insurance.

c.  There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent the underlying policies of insurance described

24

FILED DATE: 10/28/2025 1:05 PM    2025CH10999

in the Schedule of Underlying Insurance have not been exhausted by payments or judgments or settlements for damages that are covered by such underlying policies of insurance.

d.  There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent it does not seek damages in excess of the retained limit.

e.  There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent it does not seek damages because of "property damage" caused by an "occurrence" as those terms are defined in the Umbrella St. Paul Policies.

f.  There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent it does not seek damages because of "property damage" that occurred during the policy period of the Umbrella St. Paul Policies.

g.  There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent it does not seek damages caused by an "occurrence" during the policy period of the Umbrella St. Paul Policies.

h.  There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent it seeks damages because of "property damage" that took place prior and/or subsequent to the policy period of the Umbrella St. Paul Policies.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

i.     There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent it does not satisfy all elements of the insuring agreement in the Umbrella St. Paul Policies.

j.     There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent it was a known risk, known loss, or loss-in-progress.

k.     There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent a pollution exclusion set forth in the Umbrella St. Paul Policies precludes coverage.

l.     There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent it seeks damages because of "property damage" to property owned by, rented to, occupied by, or used by, or in the care, custody or control of, Versatile Metals.

m.     There is no insurance coverage under the Umbrella St. Paul for the Underlying Matter to the extent the Exclusion of Damage to Real Property set forth in the Umbrella St. Paul Policies precludes coverage, in whole or in part.

n.     There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter because Versatile Metals failed to give timely and adequate written notice to St. Paul of any occurrence, claim or suit.

o.     There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter because Versatile Metals voluntarily made and/or undertook payment(s), assumed obligation(s) and/or incurred expense(s) other than for first aid to others at the time of accident.

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

p.   There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent Versatile Metals assigned its interests under the Umbrella St. Paul Policies without St. Paul's written consent.

q.   There is no insurance coverage for the USEPA under the Umbrella St. Paul Policies for the Underlying Matter because there was no valid assignment of interests in those Policies by Versatile Metals to the USEPA.

r.   There is no insurance coverage for the USEPA under the Umbrella St. Paul Policies to the extent the USEPA released Versatile Metals before any purported assignment of interest in the Umbrella St. Paul Policies was effective.

s.   There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent that it seeks to hold St. Paul liable for sums assessed as punitive damages, exemplary damages, fines or penalties.

t.   There is no insurance coverage under the Umbrella St. Paul Policies for the Underlying Matter to the extent Versatile Metals negligently or intentionally failed to represent or disclose to St. Paul or concealed or misrepresented to St. Paul facts which were material and known by Versatile Metals in order to induce St. Paul to issue one or more of the Umbrella St. Paul Policies, or to assume certain risks in such policies.

u.   To the extent that it is determined that insurance coverage exists (defense and/or indemnity) under one or more of the Umbrella St. Paul Policies for the Underlying Matter,  such finding is subject to proper allocation of any defense

FILED DATE: 10/28/2025 1:05 PM    2025CH10999

costs and/or covered damages across all time periods during which property damage occurred.

v.  To the extent insurance coverage applies under the Umbrella St. Paul Policies, costs incurred to investigate or evaluate the nature and scope of the contamination and remediation in the Underlying Matter, including but not limited to remedial investigation and feasibility costs, would constitute indemnity costs under the Policies.

w.  There is no insurance coverage under the Umbrella St. Paul Policies to the extent that any other terms, definitions, exclusions, conditions and/or endorsements not specifically identified herein apply to preclude insurance coverage for the Underlying Matter, in whole or in part

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

## **REQUEST FOR RELIEF**

WHEREFORE, St. Paul seeks a declaration from this Court that there is no insurance coverage available with respect to Underlying Matter under the St. Paul Policies and applicable law.

<div style="margin-left:50%">

*/s/ John F. Sullivan*

John F. Sullivan (#6205900)
Plunkett Cooney, P.C.
221 N. LaSalle St., Ste. 3500
Chicago, IL 60601
(312) 970-3490

and

Charles W. Browning (Limited Scope #6316494)
Nicholas T. Badalamenti (Pro Hac Vice forthcoming)
Plunkett Cooney, P.C.
38505 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
(248) 901-4000

</div>

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

## INDEX OF EXHIBITS (TO BE FILED SEPARATELY)

**Exhibit A:**        List of the St. Paul Policies

**Exhibit B:**        The USEPA's Complaint in the Underlying Lawsuit

**Exhibit C:**        Consent Decree Agreed to in the Underlying Lawsuit

**Exhibit D1:**       Policy No. BPP 0136177 (9/13/82 to 9/13/83)

**Exhibit D2:**       Policy No. BPP 0136177 (9/13/83 to 8/29/84)

**Exhibit D3:**       Policy No. BPP 0136177 (8/29/84 to 8/29/85)

**Exhibit D4:**       Policy No. BPP 0136177 (8/29/85 to 8/29/86)

**Exhibit D5:**       Policy No. BPP 0136177 (8/29/86 to 8/29/87)

**Exhibit D6:**       Policy No. BPP 0136177 (8/29/87 to 8/29/88)

**Exhibit D7:**       Policy No. BPP 0136177 (8/29/88 to 8/29/89)

**Exhibit D8:**       Policy No. BPP 0136177 (8/29/89 to 8/29/90)

**Exhibit D9:**       Policy No. 91 136177 (8/29/90 to 8/29/91)

**Exhibit D10:**      Policy No. 91 136177 (8/29/91 to 8/29/92)

**Exhibit D11:**      Policy No. 91 136177 (8/29/92 to 8/29/93)

**Exhibit D12:**      Policy No. 40 136177 (8/29/93 to 8/29/94)

**Exhibit D13:**      Policy No. 40 136177 (8/29/94 to 8/29/95)

**Exhibit D14:**      Policy No. 40 136177 (8/29/95 to 8/29/96)

**Exhibit D15:**      Policy No. 40 136177 (8/29/96 to 9/29/96)

**Exhibit D16:**      Policy No. BPP 0800462 (8/29/87 to 8/29/88)

**Exhibit D17:**      Policy No. BPP 0800462 (8/29/88 to 8/29/89)

**Exhibit D18:**      Policy No. BPP 0800462 (8/29/89 to 8/29/90)

**Exhibit D19:**      Policy No. BPP 0800462 (8/29/90 to 8/29/91)

FILED DATE: 10/28/2025 1:05 PM   2025CH10999

**Exhibit D20:**     Policy No. 424781 (9/03/91 to 8/29/92)

**Exhibit D21:**     Policy No. 91 424781 (8/29/92 to 8/29/93)

**Exhibit D22:**     Policy No. 40 424781 (8/29/93 to 8/29/94)

**Exhibit D23:**     Policy No. 40 424781 (8/29/94 to 8/29/95)

**Exhibit D24:**     Policy No. 40 424781 (8/29/95 to 8/29/96)

**Exhibit D25:**     Policy No. 40 424781 (8/29/96 to 9/29/96)

**Exhibit D26:**     Policy No. UEL 0136179 (9/13/82 to 9/13/83)

**Exhibit D27:**     Policy No. UEL 0136179 (9/13/83 to 8/29/84)

**Exhibit D28:**     Policy No. UEL 0136179 (8/29/84 to 8/29/85)

**Exhibit D29:**     Policy No. UEL 0136179 (8/29/85 to 8/29/86)

**Exhibit D30:**     Policy No. UEL 0136179 (8/29/86 to 8/29/87)

**Exhibit D31:**     Policy No. UEL 0136179 (8/29/87 to 8/29/88)

**Exhibit D32:**     Policy No. UEL 0136179 (8/29/88 to 8/29/89)

**Exhibit D33:**     Policy No. UEL 0136179 (8/29/89 to 8/29/90)

**Exhibit D34:**     Policy No. UEL 0136179 (8/29/90 to 8/29/91)

**Exhibit D35:**     Policy No. UEL 0136179 (8/29/91 to 8/29/92)

**Exhibit D36:**     Policy No. UEL 0136179 (8/29/92 to 8/29/93)

**Exhibit D37:**     Policy No. UEL 0136179 (8/29/93 to 8/29/94)

**Exhibit D38:**     Policy No. UEL 0136179 (8/29/94 to 8/29/95)

**Exhibit D39:**     Policy No. UEL 0136179 (8/29/95 to 8/29/96)